### Andrew Montz v. Emma H. Roberts.

1. PRACTICE—*Where Judgment of Trial Court Will Be Affirmed.*— Where the court instructs the jury liberally, fairly and fully in behalf of the defendant, and the testimony of plaintiff and her witnesses, if believed, is amply sufficient to sustain the conclusion arrived at by the jury, and this court is unable to discover sufficient evidence in that of defendant and his witnesses to justify this court in holding that the verdict is not in accordance with the weight of the evidence, the judgment will be affirmed.

Assumpsit, for breach of promise of marriage. Appeal from the Circuit Court of Coles County; the Hon. FRANK K. DUNN, Judge presiding. Heard in this court at the November term, 1901. Affirmed. Opinion filed June 20, 1902.

A. J. FRYER, J. P. HARRAH and J. H. MARSHALL, attorneys for appellant.

CLARK & SCOTT and J. W. & E. C. CRAIG, attorneys for appellee.

MR. PRESIDING JUSTICE BURROUGHS delivered the opinion of the court.

This was an action of assumpsit by appellee, Emma H.

Roberts, against appellant, Andrew Montz, to recover damages for a breach of promise of marriage, which was tried in the Circuit Court of Coles County by jury, and resulted in a verdict and judgment in favor of appellee for $2,000. Appellant having moved for a new trial in the Circuit Court, and the same being denied, he excepted, brings the case to this court by appeal, and to secure a reversal of the judgment, insists that the verdict is against the weight of the evidence, and that the court refused proper instructions which he requested to be given.

The declaration charged that appellant had promised to marry appellee on the 7th day of March, 1901, but refused to do so, by reason of which she was damaged $10,000.

Appellant interposed five pleas in bar of the action: first, the general issue; second, that when the alleged promise was made, "plaintiff was a woman of ill-temper, quarrelsome disposition and of immoral conduct, and unfit, by reason thereof, of becoming the wife of defendant, all of which was at the time aforesaid, unknown to him;" third, "that before and at the time of the making of the said supposed promise, the plaintiff was a woman of lewd and immoral conduct, ill-tempered, quarrelsome, and unfit to be the wife of defendant, all of which was then and there unknown to the defendant;" fourth, "that at the time of making the said supposed promise, the said plaintiff was a woman of unchaste character and reputation, all of which was then and there unknown to the defendant;" and fifth, "that at the time of making the said supposed promise, the said plaintiff was a common liar and her reputation for truth and veracity was bad; and all of which was then and there unknown to the defendant."

Issue was joined on the first plea, and the others were traverse and issue joined.

The evidence shows that appellee is forty-one years old, lived with her father at Saulsbury, Clark county, Illinois, and had lived there since she was four years old, except for about five years, when she lived in Cumberland county with her husband, from whom she obtained a divorce, and

afterward he died, in 1897.   Appellee had one child as the result of her marriage.

Appellant is a widower, having had two wives, both of whom are dead, and he is the father of ten children.   He has lived on a farm in Coles county, Illinois, since 1861, and was acquainted with appellee's father and her widowed sister, who also lived with the father, but up to October, 1900, had never met appellee.

In October, 1900, Mr. Reynolds, an acquaintance of both appellee and appellant, had a talk with the latter at his home, in which he (appellant) told Reynolds that he was getting tired of living on the farm without a wife and wanted to get one.   Reynolds, a short time afterward, met appellee, and in a joking way, told her that appellant, a nice old man, being sober, steady and industrious, wanted a wife, and asked her if he might tell him to call on her, and she said he could.   A short time afterward, appellant went to see appellee at her father's home where he met her for the first time.   He told her that Mr. Reynolds told him that she was willing to let him come and see her, and upon his asking her if it was so, she told him yes.   When he went to go home after his first visit, he wanted to know of appellee if she objected to his coming to see her again, and upon being told that she did not, he said he would come again.

In a short time afterward he went to see her again, and they talked with each other several hours, and when he left that time, he told her he would call again.

In the early part of February, 1901, he went to visit appellee again, and she swears that during that visit he and she made an agreement to get married on the 7th of March, 1901, and that he then asked and obtained her father's consent to their getting married.

The father and sister of appellee both corroborate appellee to the extent that appellant said to the father that he and appellee had concluded to get married, and he would like to obtain the father's consent to such marriage, and that the father gave his consent.

Montz v. Roberts.

Appellant, in his testimony, admits visiting appellee, as claimed by her, and says that when he visited her the latter part of January, or the fore part of February, 1901, he said to her, "Emma, you wouldn't marry me, I'm too old;" and she said, "Yes, I would," and that then he asked her when it would suit her to get married; and she looked at a calendar and said "About the 7th of March; " and that " I told her if there was nothing come up twixt now and then I didn't know anything about, I would come down and tell her whether we would get married or not, and she said, ' All right.' " That " her father came into the room soon after, and I asked him if he had any objection to Emma and me getting married; that we had been talking something of it; and he said he didn't."

On the 22d of February, 1901, appellant called early in the morning upon appellee and told her that she was not the woman for him to marry and wanted to pay her $50, and said " he hadn't damaged her any more than that he supposed." She refused to receive the $50, and on September 18, 1901, commenced this suit.

There was some evidence tending to impeach the general reputation of appellee for truth, veracity, and chastity, which was met by other evidence tending to show that her general reputation for truth, veracity and chastity was good.

The court instructed the jury liberally, fairly and fully in behalf of the appellant, and only refused such instructions as were requested by him which were either improper or were covered by those which were given.

The testimony of appellee and her witnesses, if believed, is amply sufficient to sustain the conclusion arrived at by the jury, and we are unable to discover sufficient evidence in that of appellant and his witnesses to justify us in holding that the verdict is not in accordance with the weight of the evidence, and therefore the judgment ought to, and will be affirmed.